| | |
|---|---|
| SHEREA RAMSEUR, KRISTINA POYTNER, JARED BATES, KEVA D. PIPPIN, LINDA J. CUNDALL and GINA LOEHR, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>LIFEPOINT HEALTH, INC., THE BOARD OF DIRECTORS OF LIFEPOINT HEALTH, INC., LIFEPOINT HEALTH RETIREMENT COMMITTEE and JOHN DOES 1-30,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>**CIVIL ACTION NO.: 3:24-cv-00994** |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Sherea Ramseur, Kristina Poynter, Jared Bates, Keva D. Pippin, Linda J. Cundall and Gina Loehr ("Plaintiffs"), by and through their attorneys, on behalf of the LifePoint Health, Inc. Retirement Plan[1] ("Plan"), themselves and all others similarly situated, state and allege as follows:

## I. INTRODUCTION

1. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include LifePoint Health, Inc. ("LifePoint" or "Company"), the Board of Directors of LifePoint Health, Inc. and its members ("Board") during the Class Period[2], and the

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2] The Class Period, as will be discussed in more detail below, is defined as August 15, 2018 through the date of judgment.

LifePoint Health Retirement Committee and its members ("Committee") during the Class Period for breaches of their fiduciary duties.

2. To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002), *cert. denied*, 527 U.S. 1168 (2003).

3. At all times during the Class Period, the Plan had at least $1 billion in assets under management. At the end of 2022 and 2021, the Plan had over $2.4 billion and $2 billion, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* December 31, 2022 Report of Independent Auditor of the LifePoint Health, Inc. Retirement Plan ("2022 Auditor Report") at 5.

4. The Plan's assets under management qualifies it as jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. In 2020, only 0.1 percent (892 of 616,050) of plans in the country had more than $1 billion in assets under management.[3] In addition, this was true at the start of the Class Period in 2018 where only 0.1 percent (659 of 586,622) of 401(k) plans in the country were as large as the Plan.[4] As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses charged for the Plan's administrative and recordkeeping costs ("RKA" costs).

---

[3] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2020 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-401k.pdf.

[4] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018 at Ex. 1.2, p. 7, available at https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf.

2

5.    The Plan is also large in terms of the number of its participants. From 2018 to 2022, the Plan had between 41,501 and 54,532 participants with account balances. In 2020, only 0.1 percent (809 of 616,050) of plans in the country had more than 10,000 plan participants.[5] In addition, this was true at the start of the Class Period in 2018 where only 0.1 percent (844 of 586,622) of 401(k) plans in the country had more than 10,000 plan participants.[6]

6.    Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to control the Plan's RKA costs.

7.    Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), and failure to monitor fiduciaries (Count II).

## II.    JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

9.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

10.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and

---

[5] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2020 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-401k.pdf.

[6] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018 at Ex. 1.2, p. 7, available at https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf.

3

Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

### Plaintiffs

11.    Plaintiff, Sherea Ramseur ("Ramseur"), resides in Hickory, North Carolina. During her employment, Plaintiff Ramseur participated in the Plan and was subject to the excessive RKA costs alleged below. She suffered injury to her Plan account by overpaying for her share of RKA costs.

12.    Plaintiff, Kristina Poytner ("Poytner"), resides in Science Hill, Kentucky. During her employment, Plaintiff Poytner participated in the Plan and was subject to the excessive RKA costs alleged below. She suffered injury to her Plan account by overpaying for her share of RKA costs.

13.    Plaintiff, Jared Bates ("Bates"), resides in Pasco, Washington. During his employment, Plaintiff Bates participated in the Plan and was subject to the excessive RKA costs alleged below. He suffered injury to his Plan account by overpaying for his share of RKA costs.

14.    Plaintiff, Keva D. Pippin ("Pippin"), resides in Oklahoma City, Oklahoma. During her employment, Plaintiff Pippin participated in the Plan and was subject to the excessive RKA costs alleged below. She suffered injury to her Plan account by overpaying for her share of RKA costs.

15.    Plaintiff, Linda J. Cundall ("Cundall"), resides in Brush, Colorado. During her employment, Plaintiff Cundall participated in the Plan and was subject to the excessive RKA costs alleged below. She suffered injury to her Plan account by overpaying for her share of RKA costs.

4

16. Plaintiff, Gina Loehr ("Loehr"), resides in Las Vegas, Nevada. During her employment, Plaintiff Loehr participated in the Plan and was subject to the excessive RKA costs alleged below. She suffered injury to her Plan account by overpaying for her share of RKA costs.

17. Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

18. Plaintiffs did not have knowledge of all material facts (including, among other things, RKA cost comparisons to similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

19. LifePoint is the sponsor of the Plan and a named fiduciary of the Plan with a principal place of business at 330 Seven Springs Way, Brentwood, Tennessee. *See* 2020 Form 5500 of the LifePoint Health, Inc. Retirement Plan filed with the United States Department of Labor ("2020 Form 5500") at 1.[7] LifePoint describes itself as "a leader in community-based care and driven by a mission of Making Communities Healthier. Our diversified healthcare delivery network spans 29 states and includes more than 65 community hospital campuses, more than 30 rehabilitation and behavioral health hospitals, and more than 170 additional sites of care across the healthcare continuum … ."[8]

---

[7] The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

[8] https://lifepointhealth.net/ last accessed on June 15, 2022.

5

20. LifePoint appointed the Committee to, among other things, ensure that the Plan paid a reasonable rate for RKA services given the size of the Plan. *See* The LifePoint Health, Inc., Retirement Plan, Amended and Restated Effective January 1, 2020 ("Plan Doc.") at 12. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

21. Accordingly, LifePoint during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

22. For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

### Board Defendants

23. LifePoint, acting through its Board, appointed the Committee to, among other things, ensure that the Plan paid a reasonable rate for RKA services given the size of the Plan. *See* Plan Doc. at 12. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

24. Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

25. The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

6

**Committee Defendants**

26. As discussed above, LifePoint and the Board appointed the Committee to, among other things, ensure that the Plan paid a reasonable rate for RKA services given the size of the Plan. *See* Plan Doc., at 12. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

27. The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

28. The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

29. To the extent that there are additional officers, employees and/or contractors of LifePoint who are/were fiduciaries of the Plan during the Class Period, or were hired as Plan consultants for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, LifePoint officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

7

## IV. CLASS ACTION ALLEGATIONS

30. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[9]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between August 15, 2018 through the date of judgment (the "Class Period").

31. The members of the Class are so numerous that joinder of all members is impractical. The 2020 Form 5500 lists 54,532 Plan "participants with account balances as of the end of the plan year." 2020 Form 5500, at 2.

32. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated the Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

33. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

    A. Whether Defendants are/were fiduciaries of the Plan;

    B. Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

---

[9] Plaintiffs reserve the right to propose other or additional classes or subclasses in his motion for class certification or subsequent pleadings in this action.

C.    Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.    The proper form of equitable and injunctive relief; and

E.    The proper measure of monetary relief.

34. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

35. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

36. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

37. The Plan is a "defined contribution" plan within the meaning of ERISA Section 3(34), 29 U.S.C. §1002(34). The Plan is a "defined contribution" or "individual account" plan

9

within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. *See* 2022 Auditor Report at 7. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account. *Id.*

### *Eligibility*

38. In general, regular full-time employees are eligible to participate in the Plan. *See* 2022 Auditor Report at 7.

### *Contributions*

39. There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. *See* 2022 Auditor Report at 7.

40. With regard to employee contributions to the Plan: "[e]ach participant may elect to contribute up to 85% of his or her eligible compensation to the Plan on a pre-tax (traditional) basis or on an after-tax (Roth) basis." *Id*. During the Class Period, LifePoint made discretionary matching contributions to the Plan on behalf of its employees which are made "in the sole and absolute discretion of the Plan Sponsor's management in the form of profit-sharing contributions." *Id.*

41. Like other companies that sponsor a 401(k) plan for their employees, LifePoint enjoys both direct and indirect benefits by providing matching contributions to the Plan's participants. Employers are generally permitted to take tax deductions for their contributions to

10

401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

42. LifePoint also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

43. Given the size of the Plan, LifePoint likely enjoyed a significant tax and cost savings from offering a match.

*Vesting*

44. With regard to contributions made by participants to the Plan, "[p]articipants are immediately and fully vested in their salary deferral contributions." 2022 Auditor Report at 10. However, participants are subject to a two-year vesting schedule for contributions made by LifePoint. *Id.*; *see also* Plan Doc. at Sec. 7.5 (c)(i).

*The Plan's Investments*

45. The Plan's assets under management for all funds as of December 31, 2022 was $2,010,101,394.

*Payment of Plan Expenses*

46. During the Class Period, administrative expenses were paid for using the Plan's assets. *See* 2022 Auditor Report at 11.

## VI. THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A. The Totality of the Circumstances Demonstrates that the Plan's Fiduciaries Failed to Administer the Plan in a Prudent Manner

47. As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

11

48. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).

49. "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries" at 36, published by Vanguard, 2019.

**ERISA's Fee Disclosure Rule**

50. In January 2012, the DOL issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans. This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation."[10]

51. The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

52. As stated by the DOL, ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about

---

[10] *See* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf ("DOL 408(b)(2) Regulation Fact Sheet").

12

an employee benefit plan's services, the costs of such services, and the service providers." DOL 408(b)(2) Regulation Fact Sheet.

53.     For example, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

54.     The 408(b)(2) disclosures in short require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

55.     A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

56.     Instead, plan administrators have a separate obligation under 29 CFR § 2550, 404a-5 to disclose plan-related information, including fees for certain services to participants. Among other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g.*, plan administration, including recordkeeping, legal, accounting services)." 29 CFR § 2550.404a-5(C)(2)(ii)(B).

**B.     Costs for Recordkeeping Services Vary Little for a Plan with a Substantial Number of Participants**

57.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and

administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

58. There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A. Recordkeeping;

B. Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

C. Administrative services related to converting a plan from one recordkeeper to another;

D. Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

E. Maintenance of an employer stock fund (if needed);

F. Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

G. Plan consulting services, including assistance in selecting the investment lineup offered to participants;

H. Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s (excluding the separate fee charged by an independent third-party auditor);

14

I. Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

J. Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

59. This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

60. The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

A. Loan processing;

B. Brokerage services/account maintenance (if offered by the plan);

C. Distribution services; and

D. Processing of qualified domestic relations orders.

61. All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services,

15

self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

62. The cost of providing recordkeeping services depends in large part on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study,[11] at 4.2.2. ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."). When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increase, the average cost per participant decreases. ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.***[12]

63. In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number and character of the services provided to that additional participant.***

---

[11] https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf ("1998 DOL Study").

[12] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/.

16

64. Recordkeepers for large 401(k) plans such as Fidelity, Vanguard, Empower, and Voya, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services).

65. Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

66. The incremental costs caused by additional participants may include: mailing costs, if materials are delivered by mail versus Internet; telephone inquiries through an 800 number; check distributions from the 401(k) plan to the participant; and/or any in person or off line participant education and investment guidance requiring the personnel time of a record keepers staff member. This service is normally charged as an additional line-item cost.

67. Accordingly, plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

**C.      Much Information Regarding the Reasonableness of Fees for Recordkeeping Services are in the Sole Possession of Plan Fiduciaries**

68. As noted above, 408(b)(2) disclosures provided to plan sponsors and fiduciaries are generally not made available to plan participants. The same is true for Plaintiffs and this Plan, as Plaintiffs do not have access to any 408(b)(2) disclosures that may have been received by the Plan's fiduciaries.

69. Other information has also not been made available to Plaintiffs. For example, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.

17

70. More specifically, a RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

71. Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[13]

72. Generally, any RFPs, if conducted, would not be made available to plan participants. The same is true for Plaintiffs here who do not have direct access to such information.

73. Additionally, documentation of fiduciary fee monitoring is generally accomplished in the form of meeting minutes. These minutes do not necessarily need to be lengthy, but they should describe at minimum the fiduciary topics discussed and the rationale for resulting decisions. Any related documents or data considered for purposes of the fiduciary review (*e.g.*, market data, etc.) should be included as attachments to the meeting minutes or otherwise memorialized.

74. In an attempt to discover the details of the Plan's mismanagement, on November 8, 2021, the majority of the Plaintiffs wrote to LifePoint requesting, *inter alia*, meeting minutes from the Committee. By letter dated December 8, 2021, LifePoint denied the Plaintiffs' request for meeting minutes.

75. Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that's not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of

---

[13] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/.

a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

76. In short, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

77. For purposes of this Amended Complaint, Plaintiffs have drawn reasonable inferences regarding these fiduciary processes based upon information available to Plaintiffs, such as Rule 404a disclosures, Form 5500s filed with the DOL, market surveys, and other authority.

78. Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the imposition of excessive administrative and recordkeeping fees which wasted the assets of the Plan and the assets of participants.

**D. Circumstantial Facts and Evidence Plausibly Show the Plan Paid Unreasonable Recordkeeping Fees and/or the Plan's Fiduciaries Failed to Engage in a Prudent Process to Evaluate Recordkeeping Fees**

**1. The Plan's Recordkeepers Offered Routine Services**

79. It appears that the Plan has three recordkeepers providing services, namely, Wells Fargo, Prudential and Vanguard ("Recordkeepers") whose services at minimum overlapped in 2020 when all three Recordkeepers were reported to have received compensation from the Plan.

19

While it's not *per se* imprudent to have three entities perform RKA services, here it had disastrous consequences for plan participants. The more prudent approach would be to reduce the RKA providers to only one to take advantage of the economies of scale a large plan, such as the Plan, provides.

80.     These Recordkeepers provided services in line with the routine bundled and á la carte service categories described above. The RKA services performed each year during the Class Period were similar so we can look at the Plan's 2020 Form 5500, Schedule C as an example year. The Schedule C lists the following codes indicating the type of general services performed by the recordkeeper: 13, 15, 16, 37, 50, 62, and 64. Below is a description of the recordkeeping codes:

> 13 – Contract Administrator (Prudential)
>
> 15 – Recordkeeping and information management (computing, tabulating, data processing etc.) (Wells Fargo, Prudential, Vanguard)
>
> 16 – Consulting (general) (Vanguard)
>
> 37 – Participant loan processing (Wells Fargo, Prudential, Vanguard)
>
> 50 – Direct payment from the plan (Wells Fargo, Prudential)
>
> 62 – Float Revenue (Wells Fargo)
>
> 64 – Recordkeeping fees (Wells Fargo, Prudential)

*See* Instructions for the 2022 Schedule C (Form 5500) *available at* https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2022-instructions.pdf at 25-29. Again, the above services are not out of the ordinary of the services other national recordkeepers provide. Any fees associated with other ancillary a la carte services performed by the Recordkeepers would be negligible because it is on a participant-by-participant basis instead of plan-wide.

81.     While it may not be *per se* imprudent for a plan to have three recordkeepers, here it seems that it had disastrous effects on participants' retirement savings. It's difficult to understand

20

how the Plan could take advantage of its economies of scale to get the best possible record-keeping fees when it utilized three recordkeepers for at least one year of the Class Period as indicated on the Plan's Form 5500s, a job which is traditionally handled by only one. Given the Plan's high recordkeeping fees during the Class Period, as will be discussed in more detail below, it would have been prudent for the Defendants, to reduce the recordkeepers for the Plan to only one.

### 2. There is No Indication Defendants Negotiated to Reduce the Plan's Recordkeeping Fees During the Class Period

82. As noted above, 408(b)(2) disclosures are not available to plan participants. By the same token, because 408(b)(2) disclosures are provided from a service provider to its client, the disclosures are not available to any other plan fiduciary either. Accordingly, as noted above, the best way for a Plan fiduciary (as opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct a RFP.

83. Here, the fact that the Plan paid the relatively same amount in recordkeeping fees from 2016 to 2020, there is little to suggest that Defendants conducted a RFP, or at least an effective one, at reasonable intervals to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

84. Had the Defendants genuinely sought a competitive rate, the Plan participants would have benefited from a significant reduction in RKA costs.

85. The Philips North America 401(k) Plan (the "Philips Plan") is a real world example of how investigating the competitive market for recordkeepers can lead to significant fee reductions. In the 2020 Form 5500 for the Philips Plan, the auditor's notes state as follows:

> In 2020, and for the period from May 1, 2019 to December 31, 2019 an annual recordkeeping fee of $23 was charged to each participant's account on a periodic basis to pay for Prudential's administrative services. An annual recordkeeping fee of $33 was charged to each participant's account

21

on a periodic basis to pay for Vanguard's administrative services for the period January 1, 2019 to April 30, 2019.

*Id*. at 38 (Auditors Report, at ¶7).

86. In other words, the Philips Plan lowered recordkeeping fees by more than 30% through exploring the market and switching recordkeepers. Even without committing to a switch in recordkeepers, the information from competing recordkeepers' bids is a powerful negotiating tool.

> **3. The Plan's Recordkeeping Fees were/are Unreasonable When Benchmarked Against Other Similarly Situated Plans and Within the Context that Plan Recordkeeping Fees Should Decline as Plan Size Increases**

87. Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3. Otherwise, as plan assets grow, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.

88. As demonstrated in the charts below, the Plan's participants were saddled with above-market administrative and recordkeeping fees throughout the Class Period.

89. The Plan's per participant RKA fees were as follows:

| | Participants | Total RKA Reported[14] | $PP |
|---|---|---|---|
| **2018[15]** | 41,501 | $2,275,714.00 | $54.84 |

---

[14] To keep the total fees consistent with the comparator plans analyzed below, the total fee was determined by adding any amounts reported on Schedule C of the Plan's 5500s which are reported as either direct or indirect costs and which are coded in the categories discussed above as common RKA coding which include but are not limited to 13, 14, 15, 16, 37, 50, 60, 62, 64 and 65. Excluded from these amounts are any amounts reported as, including but not limited to, legal, accounting and/or consulting fees. Although no indirect costs are reported it is expected that once the total amount of revenue sharing is known this amount will increase.

[15] The Plan's Form 5500 indicates payment to Wells Fargo for recordkeeping services while participant account statements indicate recordkeeping payments to Vanguard.

22

| | Participants | Total RKA Reported[14] | $PP |
|---|---|---|---|
| **2019[16]** | 41,312 | $2,234,277.00 | $54.08 |
| **2020[17]** | 54,532 | $2,510,086.00 | $46.03 |
| **2021[18]** | 51,482 | $2,023,595.00 | $39.31 |
| **2022[19]** | 51,154 | $1,947,148.00 | $38.06 |

90. The above fees were astronomical when benchmarked against similar plans.

91. During the Class Period, the Plan had a low of approximately 41,312 total participants in 2019 to a high of 54,532 total participants in 2020 making it eligible for some of the lowest fees on the market.

92. As discussed above, the recordkeeping was performed throughout the Class Period by Wells Fargo, Prudential and Vanguard.

93. To fully appreciate the excessiveness of the RKA fees charged to the Plan, let's start with what another nationally recognized recordkeeper, Fidelity, itself would pay if it were in Defendants' shoes. Fidelity is a good comparator because during the Class Period it was ranked in the top ten of recordkeepers nationally – like Vanguard and Prudential - as measured by assets being recordkept:

**2020 TOP PROVIDERS (RECORDKEEPERS)[20]**

**Top 10, by Total 401(k) Assets ($MM)**

| | | |
|---|---|---|
| 1 | Fidelity Investments | $2,037,733 |
| 2 | Empower Retirement | $493,577 |
| 3 | The Vanguard Group | $454,223 |
| 4 | Alight Solutions | $434,737 |
| 5 | Principal Financial Group | $322,976 |

---

[16] The Plan's Form 5500 indicates payment to Wells Fargo for recordkeeping services while participant account statements indicate recordkeeping payments to Vanguard.

[17] The Plan's Form 5500 indicates recordkeeping payments to Wells Fargo ($1,884,135.00); Vanguard ($554,236.00); and Prudential ($71,715.00).

[18] The Plan's Form 5500 indicates recordkeeping payments to Prudential.

[19] The Plan's Form 5500 indicates recordkeeping payments to Prudential.

[20] *See https://www.runnymeade.com/blog/401k-providers-2020-top-10-lists/*

23

| | | |
|---|---|---|
| 6 | Voya Financial | $211,389 |
| 7 | T. Rowe Price | $195,224 |
| 8 | Prudential Financial, Inc. | $180,544 |
| 9 | Bank of America Corporation | $173,412 |
| 10 | Charles Schwab | $162,876 |

94. All the above recordkeepers are capable of providing the same quality of service of and they must do so to succeed in the very highly competitive 401(k) service provider arena.

95. In a recent lawsuit where Fidelity's multi-billion dollar plan with over fifteen thousand participants was sued, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso v. FMR LLC*, 451 F.Supp.3d 189, 214 (D. Mass. 2020).

96. Fidelity itself defines the relevant marketplace as plans with over a billion dollars in assets confirming the meaningfulness of the billion-dollar asset marker as used herein. Additionally, the leading publication that collects 401(k) data, BrightScope/ICI, categorizes plans in the following tranches:

24

EXHIBIT I.2

## Universe of 401(k) Plans

Distribution of 401(k) plans, participants, and assets by plan assets or number of plan participants, 2018

| Plan assets | Plans | | Participants | | Assets | |
|---|---|---|---|---|---|---|
| | *Number* | *Percent* | *Thousands* | *Percent* | *Billions of dollars* | *Percent* |
| Less than $1M | 343,108 | 58.5% | 6,007.5 | 8.4% | $107.1 | 2.1% |
| $1M to $10M | 208,789 | 35.6 | 13,660.6 | 19.1 | 620.7 | 12.2 |
| >$10M to $50M | 26,458 | 4.5 | 9,894.5 | 13.9 | 532.4 | 10.4 |
| >$50M to $100M | 3,564 | 0.6 | 4,808.0 | 6.7 | 247.1 | 4.8 |
| >$100M to $250M | 2,407 | 0.4 | 6,744.8 | 9.5 | 374.7 | 7.3 |
| >$250M to $500M | 1,034 | 0.2 | 5,395.1 | 7.6 | 362.1 | 7.1 |
| >$500M to $1B | 603 | 0.1 | 4,763.9 | 6.7 | 424.1 | 8.3 |
| More than $1B | 659 | 0.1 | 20,073.4 | 28.1 | 2,439.7 | 47.8 |
| All plans | 586,622 | 100.0 | 71,347.7 | 100.0 | 5,108.0 | 100.0 |

| Number of plan participants | Plans | | Participants | | Assets | |
|---|---|---|---|---|---|---|
| | *Number* | *Percent* | *Thousands* | *Percent* | *Billions of dollars* | *Percent* |
| Fewer than 100 | 522,277 | 89.0% | 10,960.2 | 15.4% | $709.2 | 13.9% |
| 100 to 499 | 50,477 | 8.6 | 9,841.2 | 13.8 | 549.9 | 10.8 |
| 500 to 999 | 6,375 | 1.1 | 4,424.5 | 6.2 | 266.1 | 5.2 |
| 1,000 to 4,999 | 5,807 | 1.0 | 12,136.0 | 17.0 | 886.3 | 17.4 |
| 5,000 to 9,999 | 842 | 0.1 | 5,828.1 | 8.2 | 506.0 | 9.9 |
| 10,000 or more | 844 | 0.1 | 28,157.8 | 39.5 | 2,190.4 | 42.9 |
| All plans | 586,622 | 100.0 | 71,347.7 | 100.0 | 5,108.0 | 100.0 |

Note: Assets are fair market value at the year-end of the plan and include loans. The results exclude 403(b) plans with a 401(k) feature.
Source: BrightScope Defined Contribution Plan Database

*See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2019 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

97.     Accordingly, the billion-dollar asset mark is significant as all plans over a $1 billion are considered a category of their own.

98.     Fidelity stipulated as follows: "The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that ***Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year***. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. ***The Plan did not receive any broader or more valuable***

*recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).*" *Moitoso, et al., v. FMR LLC, et al.*, No. 18-cv-12122-WGY, ECF No. 138-67, ¶ 2 (emphasis added).

99.     The significance of the Fidelity stipulation is that the Plan's demographics matches favorably with the Fidelity plan's demographics. The Plan had 50,000 plus participants during the Class Period like the Fidelity plan and was a billion-dollar plan like the Fidelity plan.

100.     Further, looking at recordkeeping costs for plans of a similar size during the Class Period shows that the Plan was paying higher recordkeeping fees than its peers.

| Recordkeeper | Plan Name | Plan Year | Assets > $1b | Assets < $1b | Participants | Cost per participant[21] |
|---|---|---|---|---|---|---|
| Fidelity | Tesla, Inc. 401(k) Plan | 2021 | Yes | | 61,773 | $27 |
| Fidelity | Publicis Benefits Connection 401K Plan | 2021 | Yes | | 48,148 | $27 |
| | **LifePoint Plan** | **2021** | **Yes** | | **51,482** | **$39.31** |
| | | | | | | |
| Fidelity | Chevron Employee Savings Investment Plan | 2020 | Yes | | 33,484 | $26[22] |
| | **LifePoint Plan** | **2020** | **Yes** | | **54,532** | **$46.03** |
| | | | | | | |
| Fidelity | Publicis Benefits Connection 401K Plan | 2019 | Yes | | 48,353 | $21 |
| Fidelity | Tesla, Inc. 401(k) Plan | 2019 | | $633,256,831 | 36,431 | $26 |
| Fidelity | The Dow Chemical Company Employees' Savings Plan | 2019 | Yes | | 37,868 | $25 |
| Great-West | Deseret 401(k) Plan | 2019 | Yes | | 34,938 | $22 |
| Vanguard | The Savings and Investment Plan [WPP Group] | 2019 | Yes | | 35,927 | $27 |
| | **LifePoint Plan** | **2019** | **Yes** | | **41,312** | **$54.08** |

---

[21] Unless otherwise noted, these fees are taken from the Form 5500. As mentioned in ¶ 90n.15, these fees were derived using the same method as the Plan's fees.

[22] See the 2020 Summary Plan Description for the Chevron Employees Savings Investment Plan attached hereto as Appendix "A."

26

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2018 | Yes | | 35,757 | $28.00 |
| Vanguard | Kaiser Permanente Supplemental Savings and Retirement Plan | 2018 | Yes | | 47,358 | $27.00 |
| Fidelity | Publicis Benefits Connection 401K Plan | 2018 | Yes | | 42,316 | $28.00 |
| T. Rowe Price | Sanofi U.S. Group Savings Plan | 2018 | Yes | | 24,097 | $23.00 |
| | **LifePoint Plan** | **2018** | **Yes** | | **41,501** | **$54.84** |

101.     The above chart demonstrates that for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees. As of the end of 2018 there were only 844 401(k) plans with 10,000 or more participants. *See* chart above. The Plan's $48.57 average per participant fee from 2018 to 2021 is almost two times the average fee of $25.58 per participant from 2018 to 2021 for the 12 plans listed above.

102.     This vast discrepancy between the Plan's RKA fees and comparable plans existed for all years of the Class Period. Indeed, the figures in the above chart are just an example of the Plan's excessive RKA fees throughout the Class Period as the Plan had an average of $46.46 per participant fee from 2018 through 2022.

103.     Additionally, to further illustrate the excessiveness of the Plan RKA costs, numerous plans during the Class Period that were smaller in assets and participants, and thus lacking the bargaining leverage of the Plan, paid less in RKA costs:

| Plan Name | Plan Year | Number of Participants | Assets Under Management | RKA Costs on Per-Participant Basis[23] | Record-keeper |
|---|---|---|---|---|---|
| Tesla, Inc. 401(k) Plan | 2019 | 36,431 | $633,256,831 | **$26** | Fidelity |
| Dollar General Corp. 401(k) Savings and Retirement Plan | 2018 | 19,118 | $355,768,325 | **$18** | Voya |
| Fedex Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2018 | 17,652 | $770,290,165 | **$30** | Vanguard |
| Pilgrim's Pride Retirement Savings Plan | 2018 | 18,356 | $321,945,688 | **$26** | Great-West |
| JBS 401(k) Savings Plan | 2018 | 19,420 | $374,330,167 | **$25** | Great-West |
| Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2019 | 14,698 | $435,391,716 | **$23** | Fidelity |
| Optumcare Management, LLC 401(k) Retirement Savings Plan | 2019 | 10,072 | $843,224,007 | **$22** | Fidelity |

104. Thus, the Plan, with over 41,000 participants and over $1.1 billion dollars in assets in 2018, should have been able to negotiate recordkeeping costs in the low to mid $20 per participant range from the beginning of the Class Period to the present. Anything above that would be an outlier especially later in the Class Period when RKA costs per participant should have been at the cheapest.

105. As alleged above, the similarities between the comparator plans and the Plan are not just limited to asset size and number of participants, although those figures are sufficient to make an adequate comparison given that recordkeeping services are a commodity service with the true value of the services not changing from one plan to another. But as alleged above, the

---

[23] In order to keep this comparator analysis consistent with the LifePoint analysis above, RKA costs in the chart are derived, in the same manner as for LifePoint, from Schedule C of the Form 5500s and reflect fees paid to service providers with service codes that signify recordkeeping, codes such as 13, 14, 15, 16, 37, 50, 60, 62, 64 and 65 are some examples, but are not limited to, these codes. See Instructions for Form 5500 (2020) at pg. 27 (defining each service code), https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2020-instructions.pdf at 27. In addition, the comparator plans chosen are plans that have little to no revenue sharing and it's for this reason that revenue sharing from a plan's funds are not added to per participant amounts.

28

comparator plans and the Plan share service provider codes that signify recordkeeping and administration services meaning the Plan and comparators were receiving similar services.

106. Further, the low to mid $20 range is not an exact rate that every Plan participant should have paid. To the extent Defendants collected recordkeeping fees through an asset-based percentage fee, the amount participants paid for recordkeeping fees was a function of a percentage level and the assets in each participant's account. Meaning, the actual amounts paid by Plan participants varied according to the assets in their accounts.

107. A lower dollar amount paid in fees is primarily reflective of a low balance in the participant's account. Therefore, if the average per participant fee was reduced to the low to mid $20 range, the pro rata rates for all participants, including those that were paying less than the low to mid $20 range, would drop proportionally according to the lever of assets in their accounts.

108. Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

**COUNT I**
**Breach of Fiduciary Duty of Prudence**
**(Asserted against the Committee)**

109. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Amended Complaint as if fully set forth herein.

110. At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

111. As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the

29

assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

112. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Amended Complaint. The Prudence Defendants also failed to control the costs of the Plan's recordkeeping and administrative costs.

113. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

114. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

115. The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT II**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against LifePoint and the Board Defendants)**

116. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Amended Complaint as if fully set forth herein.

30

117. LifePoint and the Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

118. In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

119. The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; and reported regularly to the Monitoring Defendants.

120. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

 (a) Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions, including with respect to allowing the Company to use forfeited funds to pay for Plan RKA services; and

 (b) failing to remove Committee members whose performance was inadequate in that they continued to maintain excessive RKA costs, all to the detriment of the Plan and Plan's participants' retirement savings.

121. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

31

122.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as a Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Defendants as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

32

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.     An award of pre-judgment interest;

J.     An award of costs pursuant to 29 U.S.C. § 1132(g);

K.     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.     Such other and further relief as the Court deems equitable and just.

Date: November 5, 2024         **CAPOZZI ADLER, P.C.**

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
(*Admitted Pro Hac*)
James A. Maro, Esquire
PA Attorney ID #86420
(*Admitted Pro Hac*)
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
         jamesm@capozziadler.com
Telephone: (610) 890-0200
Fax: (717) 233-4103

**LAW OFFICES OF**
**NICHOLAS D. WAITE, PLLC**

*Nicholas D. Waite*
Nicholas D. Waite, Esquire

33

Atty. I.D. #027766
112 East High Street
Lebanon, TN 37087
Email: waitelawoffices@ndw4u.com
Telephone: (855) 566-3948
Fax: (615) 348-6072

*Counsel for Plaintiffs and the Putative Class*

34

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 5, 2024, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By: <u>*/s/ Mark K. Gyandoh*</u>
Mark K. Gyandoh, Esq.

Case 3:24-cv-00994    Document 21    Filed 11/05/24    Page 35 of 35 PageID #: 310